IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Stacy A. Werle,<br>　　　　　Plaintiff, | ) | No. CV 07-400-TUC-FRZ (HCE) |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of<br>Social Security, | ) | |
| | ) | |
| | ) | |
| 　　　　　Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).   On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to the Rules of Practice of this Court.

On November 19, 2007, Plaintiff filed a Motion for Summary Judgment (Doc. No. 11) (hereinafter "Plaintiff's MSJ").  Thereafter, Defendant filed a Cross-Motion for Summary Judgment (Doc. Nos. 14, 16) (hereinafter "Defendant's XMSJ"[1]). For the following reasons,

---

[1]Citation herein to Defendant's XMSJ refers to Defendant's "Memorandum in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment" (Doc. No. 16).

the Magistrate Judge recommends that the District Court: (1) grant Plaintiff's Motion for Summary Judgment; and (2) deny Defendant's Cross-Motion for Summary Judgment.

I.      PROCEDURAL HISTORY

On September 24, 2004, Plaintiff protectively submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance benefits under Title XVIII of the Social Security Act alleging inability to work since December 9, 2002 due to "[d]egenerative/herniated disc, hip problems, [and] kidney stones." (TR. 65-67, 130). Plaintiff's application was denied initially and on reconsideration. (TR. 47-49, 51-54).

Plaintiff then requested a hearing before an administrative law judge and the matter was heard on February 23, 2006 by ALJ Milan M. Dostal (hereinafter "the ALJ"). Plaintiff, represented by counsel, and Kathleen McAlpine, a vocational expert, testified before the ALJ. (*see* Doc. No. 634). On June 14, 2006 the ALJ denied Plaintiff's claim. (TR. 15-21). On June 22, 2007, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's June 14, 2006 decision the final decision of the Commissioner. (TR.4-6). Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on January 23, 1969 and was 37 years old on the date the ALJ issued his decision. (TR.65). Plaintiff is married and lives with her husband and two children who are 19 and 16 years of age. (TR. 65, 645).

Plaintiff completed high school. (TR. 638). She has had no vocational training and did not attend college. (Id.). Plaintiff's work history includes employment as a veterinary and kennel technician from 1995 through 2000; a waitress from 1991 to 1995; and a sales clerk from 1990 to 1991. (TR. 119; *see also* TR. 638-642). Plaintiff testified that she last worked as a veterinary technician which required her, among other things, to lift dogs and cats, which were often in cages, and to administer vaccinations. (TR. 638-639; *see also* TR.

446). Her previous employment as a waitress required her to lift approximately 20 pounds. (TR. 641).

Plaintiff quit her work as a veterinary technician because of back pain. (TR. 651). Her employer had attempted to accommodate her by assigning her to the surgery schedule so that she would be able to sit more and have more flexibility about her movement. (Id.). When that became too much, she was moved to the lab but the standing bothered her back. (Id.). Finally she was placed at the front desk to answer phones and her hours were reduced. (Id.). Working at the front desk was difficult for Plaintiff because she had to bend and stoop to retrieve files and the movement made her back pain worse. (TR. 652).

Plaintiff experiences back pain four days out of a seven-day week. (TR. 80, 649). The pain travels from her lower back midway down her left thigh. (Id.). Sometimes, lying down with a pillow between her leg helps. (Id.). Prolonged standing, excessive walking, and sitting too long makes her pain worse. (Id.). She also experiences back pain from lifting, bending, and stair climbing. (TR. 84). "I also get hip pain from prolonged walking or stair climbing. Sometimes pain for no reason." (Id.). When she is in pain, she does not "even want to walk." (TR. 650). On a good day she can walk a couple of blocks before her "back starts acting up." (Id.). Sometimes pain will interfere with Plaintiff's sleep. (TR. 80). If she stands too long in the kitchen preparing meals, her back will hurt. (TR. 81).

Plaintiff gets kidney stones "maybe every month." (TR. 643). When she has a stone she is in pain "for about three weeks, sometimes longer." (Id.). When Plaintiff has kidney stones, she is unable to "go about [her] business." (TR. 650). The pain renders her unable to cook and clean for her family and she is unable to get comfortable or to sleep well. (TR. 118). Once she had a stone that remained in place for two months and finally had to be removed. (TR. 643).

Plaintiff underwent gastric bypass surgery in 2005. (TR. 644). She has since lost 110 pounds. (Id.). However, the surgery caused a reduction in the amount of fluids she is able to ingest which, in turn, aggravates her kidney stone condition. (Id.). She needs to drink a

lot of fluids to aid with passing stones.  (Id.). After the surgery she was advised to eat a high protein diet with leafy greens and lettuces. (Id.).  Yet, high protein diets lead to kidney stones and calcium in the greens also affect kidney stones.  (Id.).  "[S]o...because of the surgery, I had to do two things that basically kind of worsened up the stones."  (Id.).

Plaintiff has taken the following medications: Celebrex for inflamation; Percocet for pain; Triamterene/HCTZ for kidney stones; muscle relaxers for  back pain; Lorazepam for anxiety; Cloraxepan for anxiety; and Prozac for depression.  (TR. 134, 647-648, 650). Triamterene/HCTZ makes Plaintiff weak and light headed.  (TR. 134).  Lorazepam, which Plaintiff takes three times a day, makes her "a little light headed...a little out of it" for a couple of hours and she becomes forgetful.  (TR. 647-648).  Percocet "really makes me out of it.  I can do very little on that" for about three or four hours. (Id.).  "The muscle relaxers...kind of make me out of it also."  (TR. 647-648). When she is taking Percocet, her children will cook and clean for her.  (TR. 648).

On a typical day, Plaintiff cleans the house, runs errands, reads, watches television, and makes dinner.  (TR. 79, 112).  Plaintiff does most of the cooking and cleaning for her family.  (TR. 645-646). She is able to drive. (TR. 646). She feeds her pets, cleans up after them, and sometimes takes them for walks.  (TR. 80, 112). Her children and husband will bathe the animals and sometimes assist with feeding them. (TR. 80).  Although Plaintiff does the laundry and dusting twice a week, waters the garden, and does other cleaning, her family will sometimes have to help if Plaintiff is experiencing "bad pain."  (TR. 81, 113). Plaintiff also stated that "[c]ertain medications I take prevent me from taking care of myself or family (ex. cooking, driving)."  (TR. 91).  Plaintiff goes grocery shopping once a week for approximately 1 and one-half hours.  (TR. 82; *see also* TR. 114 (stating that she goes shopping "about every 2 weeks" for one and one-half hours) Grocery shopping will usually cause back pain  after an hour.  (TR. 116).  Plaintiff used to spend hours gardening "but it now causes too much pain."  (TR. 83). Now she gardens twice a week, cannot stand or  stoop for very long periods, and is unable to bend over to plant.  (TR. 83, 115).  She "mostly

water[s] and pick[s] any occasional weed." (TR. 83). Plaintiff keeps in touch with others by computer emails, talking on the phone, meeting for lunch and dinner, and "sometimes go[ing] to the mall." (TR. 115). If Plaintiff goes to a place where there is a lot of walking, she must stop often and sit "or else I will be painful [sic]." (TR. 84). She can walk one-half mile to one mile before needing to stop and rest. (Id.; *see also* TR. 116 (Plaintiff can walk for 20 minutes and must rest 5 minutes before resuming)).

B.      Medical Evidence

1.      Plaintiff's Treating Physicians

a.      Back Pain

In March 1996, Plaintiff complained to medical providers at Hurlburt Acute Care about back pain. (TR. 421). She reported that her work required a lot of bending, stooping and lifting. (Id.). She was given Motrin and other medication. (Id.). Plaintiff returned in July 1996 again complaining of back pain and spasm. (TR. 422). She reported no recent trauma but that she had been packing to move. (Id.). She was assessed with acute lumbar strain, directed to bed rest for 48 hours and prescribed Motrin and Flexeril. (Id.). A work excuse was also provided. (Id.).

In August 1996, Plaintiff saw Richard Sheldon, D.C., for low back pain and leg pain on the left. (TR. 423). She told him she had strained her back five months earlier while at work. (Id.). Plaintiff rated the pain in her lumbar region at a "7" with 10 being intolerable. (Id.). Dr. Sheldon assessed: lumbalgia, and sciatica caused by lumbar strain/sprain complicated by "[l]umbar I.V.D. degeneration–this is a possibility, or could be congenital thinning of L5-S1 level." (Id.).

Plaintiff returned to Hurlburt Acute Care with complaints of back pain in August 1996 reporting that bed rest, muscle relaxants and a visit to the chiropractor brought her no relief. (TR. 424). The assessment was low back pain with left leg and radiculopathy at "L5/S1." (Id.). Plaintiff was prescribed Tylenol 3 and bed rest. (Id.). In September 1996, Plaintiff was continued on Tylenol 3 and Flexeril. (TR. 425). A November 1996 record reflects that

Plaintiff underwent steroid injections six weeks earlier and that the injections helped her pain.  (TR. 426).  Plaintiff also underwent physical therapy in November and December 1996 for low back pain  on her left side.  (TR. 426, 428).

Thereafter, the record reflects that Plaintiff was "pain free" until she began experiencing lower back pain in April 2001 possibly due to heavy lifting at work for three to four weeks before the onset.  (TR. 446).  Ten months prior to onset, Plaintiff had been moving all sizes of dogs and cages at work.  (Id.).

On April 30, 2001, Dr. Craig R.K. Pack, Capt., USAF, M.C., indicated that Plaintiff was to be given work duties that "will not have her lifting greater than 20 lbs or standing longer than two hours at a time until 7 May 01."  (TR. 398).  Due to Plaintiff's continued complaints of back pain, the work restriction was continued for two additional weeks.  (TR. 399, 401).  On May 8, 2001, David L. Chin, Maj. USAF, MC, FS, indicated that effective May 22, 2001, Plaintiff was further restricted to "no lifting" and "no standing over 5 minutes."  (TR. 408).   During this time Plaintiff was prescribed Naprosyn and was referred to physical therapy.   (TR. 400; *see also* TR. 403 (patient "with lower back pain not improving adequately with conventional pain meds including percocet."))  On May 17, 2001, Plaintiff's limitations were changed to light duty for 30 days, no lifting greater than 20 pounds, no prolonged standing, no running, jumping or climbing.  (TR. 405; *see also* TR. 409 (efforts documented by Plaintiff's employer to comply with work restrictions)).

In May 2001, Plaintiff attended "back school" regarding prevention of back pain.  (TR. 406-407).  By July 2001, Plaintiff had completed physical therapy and her condition was improving.  (TR. 410, 446, 00310[2]).  As of July 2001, her diagnosis was low back strain.  (TR. 446).  "Most days [patient] has full r[ange] o[f] m[otion] and no pain.  Does have intermittent

---

[2]This record was in the transcript but does not contain a transcript page number.  It is Bates stamped as 00310.

l[ow] b[ack] p[ain] [about] 2 times /wk.  Pain is dull and causes little interference in daily activity skills when present."  (Id.).

Plaintiff continued to complain about low back pain in November and December 2001.  (TR. 412, 414).  In November, she was restricted to lifting no more than 25 pounds. (TR. 413).  Treatment included prescriptions for Valium, Tylenol 3, heat, ice, and stretching exercises.  (TR. 414).  Also, in December, Plaintiff complained that the pain radiated from her low back to her buttock and thigh.  (TR. 418).  An MRI was scheduled.  (Id.).

In January 2002, Neurosurgeon Cyril T. Sebastian, M.D., noted that Plaintiff's examination was unremarkable but her MRI results showed "L5-S, degenerated and herniated disc."  (TR. 444).  Dr. Sebastian diagnosed Plaintiff with lumbar disc degeneration and herniated disc at L5-S1.  (TR. 369).  He referred Plaintiff to physical therapy and limited her to "no prolonged standing or heavy lifting over twenty pounds...for two months", no bending, pushing or pulling, and limited squatting and climbing for only one hour per day. (TR. 369-370, 452).

By March 2002, Plaintiff reported no improvement from physical therapy.  (TR. 374). Dr. Sebastian noted that "a simple discectomy would be unlikely to help.  A fusion is the best option if it comes to surgery."  (Id.).  Plaintiff indicated to Dr. Sebastian that she did not want steroid injections because "[s]he has tried them in the past with only temporary improvement."  (TR. 375).  Plaintiff was continued on physical therapy with a change in exercises.  (Id.).  Dr. Sebastian continued Plaintiff's restrictions of no prolonged standing or heavy lifting over twenty pounds for the next three months.  (TR. 376).  Through June 2002, Plaintiff continued on Valium but it did not help the pain.  (TR. 379-380).

A July 8, 2002 Provider's Note indicated that Plaintiff had "chronic intermittent L[ow] B[ack] P[ain] secondary to H[erniated] N[ucleus] P[ulposus] and overweight....[Patient] has been evaluated by Neurosurgery and has been offered surgery vs steroid injections. [Patient] previous [sic] declined both.  Now considering steroid injections.  [Patient] has been requiring Percocet or Valium every other month for a couple days on average when pain gets

severe."  (TR. 381). In late July 2002, with continued complaints of increasing low back pain, which was worse with prolonged standing and which occasionally radiated to her left hamstring, Plaintiff began epidural steroid injections.  (TR. 385). The following month, Plaintiff reported "some relief."  (TR. 386). Later, in August 2002, Plaintiff reported back pain resulting from wrestling with a co worker.  (TR. 388). In November 2002, she fell from her swivel chair at work and pain developed.  (TR. 393). On November 20, 2002, Dr. Sebastian noted Plaintiff's report that the "pain comes and goes" and that two epidural steroid injections did not help.  (TR. 397). He diagnosed "L4-5 degenerative disc disease. L4-5 fusion may be helpful but will need to lose weight."  (Id.).  He referred Plaintiff to a dietician.  (Id.).

By January 2003, Plaintiff reported that she was trying to lose weight with slow progress.  (TR. 318). In March 2003 Plaintiff continued reporting back pain radiating to her left leg.  (TR. 323-324) Her pain was 6 out of 10.  (TR. 324). Assessment was low back pain with sciatica and she was prescribed Percocet, Elavil, Zantac, and directed to continue physical therapy.  (Id.).

In July 2003, Plaintiff reported that the pain increased with forward flexion.  (TR. 336).  She also stated that although exercises have helped in the past, "she tends to quit doing them when the pain diminishes...."  (Id.).  She "has considered having a stomache [sic] banding procedure to help lose weight so that her exercise tolerance might be better...."  (Id.). Plaintiff's back pain radiating to her lower left side was exacerbated because she was packing to move and was bending and lifting light boxes and items.  (TR. 338; *see also* TR. 337). Plaintiff was given an injection of Ketorolac, was prescribed Valium, and a heating pad was recommended.  (TR. 337, 340).

September 2003 treatment notes indicate that Plaintiff has "received long standing..." physical therapy and is obese.  (TR. 347). "She was seen by neurosurgery who declined to operate until she loses weight."  (Id.).  In October 2003, Plaintiff reported that her hip felt better in the morning and pain worsened with activity.  (TR. 350). Physical therapy for low

back pain also caused pain in her hip.  (Id.).  By December 2003, the assessment included low back pain and "possible S1 joint inflam[mation]..." and she was continued on Celebrex. (TR. 365).  Plaintiff also continued in physical therapy through the end of 2003.  (TR. 352, 351-356).

In December 2003, Plaintiff reported that Vioxx and Celebrex caused heart burn. (TR. 363, 364).

Plaintiff was continued on physical therapy through 2004.  (TR. 306-308).  In July 2004, when Plaintiff presented with complaints of back pain, she also expressed concerns about anxiety and was referred to "life skills for psychiatry."  (TR. 310) (also indicating diagnosis of anxiety disorder not otherwise specified, mild)

A December 2004 MRI reflected: "L4-5: Mild disc bulging and possible tiny left disc protrusion, not displacing left L5 nerve....Otherwise normal exam (T10-S2 levels)."  (TR. 304.).

In January 2005, Flight Surgeon Lisa B. Fireston upon review of the 2004 MRI results indicated no foraminal narrowing and no nerve impingement.  (TR. 302).  She assessed "mild degenerative disc..." disease as per the MRI.  (Id.).

As of May 2005, Plaintiff's weight was 273 pounds and she was 66 inches in height. (TR. 187).  On June 28, 2005, Plaintiff underwent gastric bypass surgery.  (TR. 142-145; *see also* TR. 159 (Plaintiff's psychiatrist noted that Plaintiff "has gone to get gastric surgery to assist her in losing her excessive weight which should alleviate her chronic pain in the hip, back, and general body aches.")) Preoperative and postoperative diagnoses were:  medically complicated obesity.  (TR. 144).  By March 2006, Plaintiff had lost 110 pounds.  (TR. 626; see also TR. 553).

In January 2006, Plaintiff reported shooting back pain radiating from her back to her legs.  (TR. 476).  She exhibited pain on flexion of the L-S spine. (Id.).  Assessment was "acute on chronic low back pain..." with L5 radiculopathy.  (Id.).  She was given Flexeril and Amityptline and instructed to apply ice and heat.  (Id.).

In January 2006, Plaintiff saw Charles Needham, M.D., for a consultation regarding back and left leg pain. (TR. 495-497). On physical examination he noted that Plaintiff "has some pain on flexion and hyperextension of the lumbar spine, although her range of motion is fairly good. Straight leg raising similarly was good at 90% bilaterally with no evidence of any paralysis." (TR. 496). He requested an MRI. (Id.). A January 25, 2006 MRI showed: "[s]mall left-paracentral disk bulge at L4-L5, without evidence of significant canal or neural foraminal stenosis....The disk at this level is moderately desiccated, and the disk space at this level is moderately narrowed. There is additional mild facet joint arthropathy at this level." (TR. 498-499). When Dr. Needham saw Plaintiff in February 2006, he opined that

> she is not a surgical candidate at present, although she might be a surgical candidate in the future if her pains become more severe and more consistent. She has the pains approximately 4 days out of every 7, and on the 3 good days she is apt to have occasional pains. She has had difficulty at work in the past because of her intermittent pains, and during those episodes she needs to lie down. I do consider her disabled from work at present. I told her that the disk rupture is a chronic one....

(TR. 503-504). His "FINAL DIAGNOSIS" was degenerative disk disease L4-L5 with lateral disk rupture on the left L4-L5 and lumbar spondylosis with facet arthropathy L4-L5 bilaterally, L5-S1 bilaterally. (TR. 504). Dr. Needham set the following work restrictions: Plaintiff could lift less than 10 pounds; she could stand and/or walk less than 2 hours in an 8-hour workday; she could sit less than 6 hours in an 8-hour work day; she was limited in pushing and pulling in her lower extremities; she could never climb, balance, stoop, kneel, crouch, crawl; and she could occasionally reach in all directions. (TR. 505-506). He further indicated that Plaintiff's ability to function was moderately affected and that she was unable to work at present. (TR. 507).

### b.      Kidney Stones

In October 2000, Plaintiff presented to the emergency room with "left renal colic." (TR. 420). A November 17, 2000 CT scan of the abdomen revealed a kidney stone. (Id.). Plaintiff was given the option of surgical removal through ureteroscopy or hydration and pain management and she chose aggressive hydration and pain management. (TR. 419).

On May 9, 2003, Plaintiff reported passing a kidney stone the night before, that she had a history of kidney stones, and that her abdominal pain decreased since passing the stone. (TR. 327). A May 21, 2003 CT can revealed "[a] 6 mm left distal ureteral stone without evidence of associated obstruction on...that side" and "small intrarenal stones in the mid poles bilaterally." (TR. 330).

On June 6, 2003, Plaintiff returned to the emergency room complaining of abdominal pain and was prescribed Levaquin and Colace. (TR. 333).   On June 24, 2003, she brought to her medical provider a kidney stone that she had passed the week before. (TR. 335).

In July 2003, she once again presented to the emergency room complaining of abdominal pain for the past three days in addition to pain in her left flank and lower back. (TR. 341). The assessment was kidney stone (renal lithiasis)  and Plaintiff was prescribed Percocet. (TR. 342). Urological laboratory results showed Plaintiff had "increased urinary calcium and acid pH." (TR. 344). The stone analysis showed primarily calcium oxalate and some calcium phosphate. (Id.)  Plaintiff was advised to continue regimen of increased fluids limiting calcium in her diet. (Id.).

In September 2003, Plaintiff presented with complaints of sharp pain in her left lower back and stomach; she was prescribed medication, including Percocet as needed for stone pain; and followed up with urology who advised her to increase urinary output to two litres per day. (TR. 346, 348). In November 2003, Plaintiff was prescribed Darvocet for pain associated with kidney stones. (TR. 358). A November 6, 2003 CT scan showed

> several 1-2 mm. punctate calcifications noted within the medullary portion of both kidneys (medullary nephrolithiasis). There are no ureteral calculi evident. There is no evidence of hydronephrosis involving either renal collecting systems.  The kidneys appear morphologically normal without focal renal lesion or mass.  There are no perinephric fluid collections evident.

(TR. 359). The impression was: "Findings of bilateral medullary nephrolithiasis." (Id.).

On  December 3, 2003, Plaintiff was assessed with recurrent stone disease, "the medullary [illegible]...raises the question of medullary sponge kidney...Diet rich in protein...may aggravate stone disease...sleep apnea...[illegible]." (TR. 361).  On December

- 11 -

23, 2003, Plaintiff presented with pain that felt like a spasm.  (TR. 367).  She reported that Darvocet provided no relief.  (Id.).  The assessment was kidney stone and Percocet and hydration were prescribed.  (Id.).

A January 2004 CT scan showed "[m]ultiple small bilateral renal calculi, with no evidence for hydronephrosis."   (TR. 440).  ("several less-than-3-mm renal calculi bilaterally...There are no ureteral stones identified.").

In February 2004, Plaintiff complained of abdominal pain associated with kidney stones. (TR. 307).  In March 2004, she presented with complaints of recurrent left flank pain radiating into the left lower quadrant which was similar to pain she felt with kidney stones. (TR. 438). The attending physician indicated that Plaintiff was "probably passing [a] small stone..." and prescribed Percocet.  (TR. 439). In May 2004, Plaintiff reported passing "a little gravel" two weeks previously.  (TR. 436). The assessment was renal stone disease-active. (TR. 437). Plaintiff was directed to continue on Dyazide and to stay hydrated.  (Id.). Plaintiff again presented with pain associated with kidney stones in June 2004.  (TR. 309). In August 2004, Plaintiff's Darvocet prescription was refilled with regard to "calculus of ureter."  (TR. 311).  In September 2004, Plaintiff presented with right-sided flank pain and was continued on Darvocet.  (TR. 434-435).

An October 2004 CT scan showed a "5 x 3 mm stone just inside the bladder and adjacent to the right ureterovesical junction...[and] small punctate renal stones" as well as "a large 'nephro-calculith' in the right inferior renal pole which measures 4.6 x 3 mm."   (TR. 432).

In November 2004, Plaintiff presented four times with complaints of abdominal pain. (TR. 312 (November 10, 2004, seeking treatment at urgent care); TR. 313 (November 12, 2004,  still having back pain); TR. 316 (November 16, 2004, because shooting abdominal pains were "unrelenting [with] Darvocet", Percocet was prescribed); TR. 429-430 (November 17, 2004, where assessment was chronic pain from nephrolithiasis, "persistent hypercalciuria despite HCTZ...")).

A January 2005 record reflects that Plaintiff passed her first stone in October 2000, she has passed multiple stones since that time, and the last stone passed was in October 2004. (TR. 298). The assessment was recurrent renal stones, elevated "U c[itrate]". (TR. 297). She was continued on HCTZ. (Id.). In February 2005, Plaintiff presented with left flank pain similar to pain associated with kidney stones. (TR. 303, 279). She stated that, on the pain scale, the pain ranked at 3 but it was at 6 the previous night. (Id.). Assessment was recurrent nephrolithiasis and Percocet was prescribed. (Id.).

Plaintiff changed medical facilities and in March 2005 when she was seen to establish care at her new location, she complained of left lower quadrant pain beginning the previous day. (TR. 282).

An April 2005 CT scan showed "[s]table small bilateral renal calculi." (TR. 285, 295). On April 18, 2005, Plaintiff was examined by Sanjay Ramakumar, M.D. who also reviewed Plaintiff's prior MRIs. (TR. 291-293). Dr. Ramakumar's assessment was bilateral renal calculi with recurrent nephrolithiasis and recently passed right ureteral calculus. (TR. 293). He recommended against surgical "removal of her punctate renal calculi....She will be better served by an aggressive metabolic evaluation and medical management. We will refer her back to the stone clinic for completion of her evaluation and recommendations by the nephrologist." (Id.).

In May 2004, Plaintiff saw Howard Lien, M.D., at the University of Arizona Renal Stone Clinic. (TR. 195-196). Her physical examination was unremarkable and she did not exhibit costovertebral angle tenderness (hereinafter "CVA"). (TR. 195). The assessment was bilateral nephrolithiasis and Plaintiff was asymptomatic and doing well at that time. (Id.).

In June 2005, Plaintiff saw William Walker, Capt. USAF, MC, FS, to renew pain medication "due to stone passage" and was prescribed Percocet. (TR. 277). On June 11, 2005, Plaintiff presented to the emergency room with multiple tiny stones in her right kidney. (TR. 274-276). At a July 26, 2005 appointment for evaluation of blood in urine, physical examination showed Plaintiff had no CVA tenderness. (TR. 170).

- 13 -

On August 22, 2005, Plaintiff requested a refill of pain medication for "lots of pain." (TR. 211). At an appointment the next day, she reported experiencing pain the previous three days and blood in her urine. (TR. 210). She also reported that she had been to the emergency room the week before. (Id.; *see also* TR. 212 (August 2, 2005 note regarding follow up after Plaintiff's July 29, 2005 emergency room visit)) The assessment was kidney stones and Ultracet and increased fluid intake were prescribed. (TR. 210; *see also* TR. 209 (Ultracet was changed to Percocet after stomach upset)).

A September 7, 2005 CT scan revealed "[i]nterval development of mild right hydronephrosis, with a 5.8-cm right mid ureteral calculus present." (TR. 202). Comparison with previous studies showed a "decrease in the number of previously-mentioned bilateral renal calculi. In addition, there has been interval development of mild to moderate right hydronephrosis. There is mild to moderate right hydroureter present to the level of the mid ureter, where there is a 5.8-x-4-cm calculus present. Mild periureteral stranding is additionally present." (Id.). A September 19, 2005 CT scan showed a "5-mm stone in the distal right ureter which likely represents the previously described stone in a more distal position." (TR. 200). No new renal or ureteral calculi were identified and there was no significant hydronephrosis. (TR. 201). On September 20, 2005, Plaintiff, with a diagnosis of right ureteral calculus, underwent a [c]ytoscopy, right ureteroscopic laser lithotripsy. (TR. 197-198).

In November 2005, Plaintiff was treated for urinary tract infection. (TR. 481). On December 5, 2005, she presented with complaints of pain associated with kidney stones and she was prescribed Darvocet and Toradol and directed to stay hydrated. (TR. 479). Even though her pain eventually subsided, it returned on December 23, 2005. (TR. 478). She reported that she had seen "gravel" upon urination. (Id.). Upon examination Plaintiff had mild diffuse tenderness at the left "upper/lower back...." and mild CVA tenderness. (Id.). Toradol was prescribed. (Id.).

In early January 2006, Plaintiff continued to complain of pain associated with kidney stones.  (TR. 477).  On examination, she exhibited CVA tenderness on the left side.  (Id.).  Darvocet was prescribed.  (Id.).

On April 5, 2006, Plaintiff saw Dr. Lien for follow up.   (TR. 587-588).  She complained of experiencing left flank pain for the previous two weeks and reported "a couple of episodes of urinary tract infection....She was told to have crystals in her urine."  (TR. 587).  Physical examination was unremarkable.  (Id.).  Dr. Lien's assessment was "[r]enal stone, the stones have been removed.  She has symptoms again."  (Id.).  He noted that her urinary tract infection had resolved.  (Id.).  He continued Plaintiff on Percocet for flank pain and scheduled a followup appointment for the next month.  (Id.).  An April 21, 2006 CT scan showed "2 mm nonobstructing calculus within the upper pole of the left kidney."  (TR. 590).  No additional renal or ureteral calculi were identified.  (Id.).

On May 16, 2006, Plaintiff sought treatment for blood in her urine.  (TR. 617).  There was no evidence of infection.  (TR. 619).  Plaintiff received pain medication.  (Id.).  Dr. Lien saw Plaintiff again on May 22, 2006.  (TR. 584).  She reported passing a small stone two days earlier.  (Id.).  "She had gross hematuria on 05/18 which is cleared now.  She still has pain in her left flank and the left lower quadrant....Her pain reached at peak on Saturday and now has significantly improved."  (Id.). Dr. Lien noted that lab results from April and May 2006 showed blood trace protein .  (Id.).  He assessed renal stone, opined that her current pain was "probably due to ureter spasm" and prescribed Percocet.  (Id.).

On June 1, 2006,  Plaintiff complained of "severe pain..." from kidney stones and that Percocet was upsetting her stomach.  (Tr. 615).  Vicodin was prescribed.  (TR. 616). On June 2, 2006, Plaintiff presented for treatment with complaints of abdominal pain in the left lower belly.  (TR. 613, 614). Plaintiff returned for treatment on June 13, 2006 stating that she had "a pain free day yesterday but the day before the pain was the worst it had been in a while.  Today it is there 4/10. [P]ain is LLQ without radiation" and Vicodin was not providing relief.  (TR. 607). On exam, Plaintiff was tender to palpation in the left lower quadrant of her

abdomen.  (TR. 608).   Oxycodone/APAP (Percocet) was prescribed.  (Id.).   On June 15, 2006, Plaintiff presented at the emergency room complaining of constant and sharp abdominal pain in her lower left quadrant.  (TR. 538 (Plaintiff rated the pain at 6/10)).   On physical examination, Plaintiff "appear[ed] somewhat uncomfortable", her abdomen was mildly tender on palpation of the left lower quadrant and left lateral quadrant, and she showed no significant CVA tenderness.  (TR. 538-539).  A CT scan showed a "stone in the ureter on the left side that is 5 mm."  (TR. 539; *see also* TR. 542). The attending physician, Laurie Herrera, M.D., discussed removal of the stone with Plaintiff and Plaintiff opted to follow up with her urologist.  (TR. 539).  Diagnosis was kidney stone and mild urinary tract infection.  (Id.).   Plaintiff was prescribed Levaquin, increased dosage of Percocet, and Phenergan.  (Id.).  At a June 19, 2006 followup appointment with physician Brian Jenkins, Plaintiff was still experiencing constant pain in her low left quadrant, which she ranked as "5/10..." and her urine was tea colored.  (TR. 604). Physical examination revealed direct tenderness in Plaintiff's left lower quadrant.   (Id.).   Dr. Jenkins assessed hydroureteronephrosis, injected Ketorolac and prescribed Oxycodone/APAP (Percocet).  (Id.).

On June 20, 2006, Plaintiff saw urologist Peter J. Burrows, M.D.  (TR. 527). Plaintiff reported that she was taking the following medications: Prozac, Lorazepam, Clonazepam, Allopurinol, Percocet, Levaquin, Phenergan, and vitamins.  (TR. 525, 527).  Dr. Burrows noted Plaintiff's three-to-four year history of kidney stones. (TR. 527).   His impression included: "persistent kidney stones...with left abdominal pain.  CT scan on 6-15-06 revealing upper tract left ureteral stones and proximal hydronephrosis...", "[l]arge microscopic hematuria", and "[c]oncomitant medical diseases including status post gastric bypass, anxiety, depression, and elevated uric acid."  (TR. 527-528).  He planned tests to determine whether "this is truly a calcium oxalate stone or perhaps a uric acid stone."  (TR. 528). He prescribed Percocet for pain management.  (Id.).   On June 27, 2006 Plaintiff's Percocet prescription was refilled.  (TR. 602).  A June 21, 2006 radiologic examination report

reflected "amorphic left calcification consistent with history, though nonspecific." (TR. 530).

A July 14, 2006 CT scan showed "a 3.5 mm calculus situated within the proximal to mid left ureter associated with mild hydronephrosis of the proximal left renal collecting system." (TR. 535). On July 26, 2006, Dr. Burrows performed a "[l]eft ureteroscopy with laser tripsy, stone basketing, and stent placement." (TR. 523). He noted that since Plaintiff's gastric bypass surgery, she has had a long history of uric acid stones. (Id.). A "computed tomography scan revealed persistent moderate hydronephrosis with distal 3-4 mm impacted ureteral stone." (Id.). Plaintiff was released with prescriptions for Vicodin and Ciprofloxacin and was scheduled to have the stent removed one week after the surgery. (TR. 524, 521).

On August 1, 2006, Dr. Burrows removed the stent and noted that Plaintiff "is a metabolic stone former, likely from her gastric bypass forming uric acid stones from shortcuts." (TR. 518). He continued her on Allopurinol. (Id.). On August 16, 2006, Plaintiff reported left abdominal pain and requested pain medication because Tylenol was not helping. (TR. 517). An August 22, 2006 CT scan revealed no stones and that "[l]eft hydronephrosis had resolved well." (TR. 534). Plaintiff's August 22, 2006 request to switch from Percocet, which was making her sick, to Vicodin was denied because she did not have any kidney stones. (TR. 516). On August 28, 2006, Plaintiff reported "non-stopping pain..." and a CT scan was ordered. (TR. 515).

c.    Psychiatric

In April 2005, as part of the presurgical screening process for gastric bypass surgery, Plaintiff underwent a psychological screening with Sean Flynn, Ph.D. (TR. 167-168). Dr. Flynn's behavioral observations included Plaintiff's "thought process appeared logical and coherent. Her mood appeared euthymic and her affect was mood congruent. There was no evidence of perceptual problems....Her cognition appeared grossly intact and her insight and

judgment appear to be good."  (TR. 168).    Results from the Minnesota Multphasic

Personality Inventory-2 (hereinafter "MMPI-2") suggested that Plaintiff[3]

> responded in a way that is similar to individuals who are not experiencing a great deal of emotional difficulty at this time.  However, she did have a response pattern similar to individuals who are experiencing some symptoms of depression, particularly the subjective elements of depression such as having unhappiness, low energy, nervousness, feeling inferior, etc.  Other scales on the MMPI-2 on which she scored differently than an average woman also suggested that she might have difficulty with anxiety and with feelings of being isolated and not understood by others.

(TR. 168). He noted that Plaintiff  "reports having symptoms of a problem with mood.  The

results of the MMPI-2 are valid and also suggest that Ms. Werle may be experiencing some

depression and anxiety at this time."  (Id.).  Dr. Flynn found that Plaintiff was a good

candidate for surgery from a psychological standpoint.  (Id.).  However, he recommended

that Plaintiff meet "with a therapist to discuss her mood and the life situations that may be

contributing to symptoms of depression and anxiety."  (Id.).  He also recommended

psychiatric evaluation to determine whether medication may help with her anxiety and

depression.  (Id.). Dr. Flynn's diagnosis was:

| Axis I: | 311 | Depressive Disorder Not Otherwise Specified |
|---|---|---|
| | 300.00 | Anxiety Disorder Not Otherwise Specified |
| | | R/o Major Depressive Disorder, Recurrent, Moderate |
| Axis II: | V71.09 | None |
| Axis III: | | Obesity, Back and Hip Pain |
| Axis IV: | | Problems with Primary Support Group, Problems with Health |
| Axis V: | | Current = 75; Highest Past 12 Months = 75 |

(TR. 169).

On May 16, 2006, Plaintiff saw Psychiatrist Alfredo C. Ramirez, M.D.  (TR. 159-

162). Dr. Ramirez noted that Plaintiff was oriented, her thought process was not tangential,

she did not appear delusional, her mood was anxious, her insight was "intact good", her

affect was depressed and her judgment was good.  (TR. 160). His diagnosis was:

---

[3]Dr. Flynn's report mistakenly refers to Plaintiff Werle in one instance as "Ms. Ferguson."  (TR. 168).

- 18 -

| Axis I: | 296.33 | Major Depression Recurrent |
|---|---|---|
| Axis I: | | Dysthymia |
| Axis I: | | Anxiety NOS |
| Axis II: | | none |
| Axis III: | | obesity, GI upset with Codeine |
| Axis IV: | | marked with increased weight and family issues |
| Axis V: | | G[lobal] A[sssement of] F[unctioning[4]] current: 75 |
| | | GAF in past 1 year: 75 |

(TR. 160; *see also* TR. 158)). Dr. Ramirez prescribed Prozac. (TR. 158). He found no psychiatric reason to prevent gastric bypass surgery. (Id.).

In June 2005, Dr. Ramirez noted that Plaintiff was "doing much better with the Prozac." (TR. 165). Dr. Ramirez ranked Plaintiff's major depression disorder as 7/10[5] in severity, her GAF at 70, and he continued her on Prozac. (Id.). He noted that her mood was anxious and depressed. (Id.). Her mental status and affect were normal. (Id.).

In July 2005, Dr. Ramirez noted "decreased effects of Prozac." (TR. 165). He found Plaintiff's severity level remained at 7/10, her GAF remained at 70, and her mood was anxious and depressed. (Id.). He continued her on Prozac. (Id.). Dr. Ramirez's records from September 2005 reflect no change. (TR. 163) In October 2005, Dr. Ramirez's notes reflected no change in Plaintiff's severity level, GAF score or mood; however, he indicated that he had discussed mental imagery with Plaintiff "to deal with her aversion and fear of food...." and he prescribed Lorazepam in addition to Prozac. (TR. 563) In January 2006, Dr. Ramirez noted Plaintiff's increased stress at home and he continued her on Prozac and Lorazepam. (TR. 562).

On February 6, 2006, Dr. Ramirez completed a Medical Source Statement Concerning the Nature and Severity of Plaintiff's Mental Impairment. (TR. 491-494). He indicated that Plaintiff was not significantly limited regarding understanding and memory, her ability to

---

[4]Hereinafter "GAF".

[5]On such scale 0 "is not a problem [/] resolved", 5 is "distressing/limiting", and 10 is "very severe distress, disruption, harm/risk." (TR. 165).

carry out short and simple instructions, and her ability to carry out detailed instructions.  (TR. 491-492) She was mildly limited in her ability to: maintain attention and concentration for extended periods; be aware of normal hazards and to take appropriate precautions; and travel in unfamiliar places or use public transportation.  (TR. 492-493) She was moderately limited in her ability to: perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision;  work in coordination with or proximity to others without being unduly distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and to respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;  respond appropriately to changes in the work setting; and set realistic goals or to make plans independently of others.   (Id.).   He opined that the limitations lasted 12 continuous months or can be expected to last 12 continuous months.  (TR. 493). He further stated that Plaintiff's

> Major Depression Recurrent 296.33 as well as her Anxiety Disorder make it difficult for her to be in a regular work situation. Functionally she is affected by depression; feels guilty about thing [sic] without any rational reason.  This same low self esteem keeps her from dealing with peers in the work place.

(TR. 494).

On February 18, 2006, Plaintiff reported that "she is very anxious..."  and had additional stressors at home.  (TR. 561).  Dr. Ramirez added Klonapin to Plaintiff's medications.  (Id.).  He also ranked her severity level at 7/10, her GAF at 50 and he indicated Plaintiff was anxious and depressed. (Id.).   In March, 2006,  he continued her on all medications and "went through mental imagery to work with her anxiety."  (TR. 560). Her

severity level remained ranked at 7/10, her GAF at 50, and her mood continued to be anxious and depressed.  (Id.).  In April 2006, Plaintiff reported that "her anxiety and panic has not been a problem however she gets the fear and then it does not develop to a full blown panic attack..."  (TR. 559).  Dr. Ramirez assessed Plaintiff with a 7/10 severity level, with a GAF at 50, and indicated that her mood was anxious.   (Id.).  He directed Plaintiff to alternate Prozac dosages. (Id.) In May 2006, Plaintiff reported stress at home and about her health. (TR. 558).  She "had only one episode of anxiety and it did not go to a full loss of control!" (Id.) (exclamation mark in original).  Dr. Ramirez found Plaintiff's mood to be anxious. (Id.).  Her severity level was 7/10 and her GAF was 50.  (Id.).  In June 2006, he noted that Plaintiff's mood was "stable not depressed" and that Plaintiff "had only one episode of anxiety in parking lot when the car would not run."  (TR. 557).  He ranked her severity level at 8/10, her GAF at 50, and added a prescription for Ambien.  (Id.).  In July 2006, Dr. Ramirez noted Plaintiff's high anxiety with regard to pending health issues and that her mood was stable and not depressed.  (TR. 555-556).  He ranked her severity at 8/10, her GAF at 50, and indicated her mood was anxious.  (Id.).  He replaced Ambien with Lunesta.  (TR. 556).

The record also reflects that from May 2004 through July 2006, Plaintiff saw therapist Carol Wechsler Blatter, CISW, DCSW, on a regular basis. Topics discussed during sessions included Plaintiff's pain from her hip, back and kidney stones; Plaintiff's obesity/weight issues; Plaintiff's low self esteem; Plaintiff's feelings of anxiety and stress; marital and parental issues/relationships; and other health issues.

At Plaintiff's 2004 initial psychological evaluation, therapist Blatter diagnosed "adjustment disorder w/mixed anxious and depressed mood (309.28)" with a GAF of 58. (TR. 222). In June 2004, they discussed the possibility of medication to decrease Plaintiff's anxiety and stress.  (TR. 264).

In September 2004, therapist Blatter diagnosed adjustment disorder with mixed anxious and depressed mood.  (TR. 229). Plaintiff's GAF score was 59.  (Id.).   Therapist Blatter also indicated that Plaintiff's insight and judgment were limited, she was depressed,

experienced sleep disturbance, had anxiety and somatic complaints. (Id.).  Treatment goals included increasing Plaintiff's self esteem and decreasing conflicts with Plaintiff's spouse and children.  (Id.).

In January 2005, therapist Blatter's diagnosis was "Depressive Disorder NOS (311)" and that Plaintiff had anger, anxiety, decreased energy, depression, sleep disturbance, and somatic complaints and limited insight.  (TR. 221, 228).   She stated that Plaintiff had improved during the last year of treatment.  (TR. 228). Plaintiff's GAF score was 59 (TR. 221) or 60. (TR. 228).  Treatment goals included decreasing depression, stress, and anxiety; improving marital communications; and improving health focusing on weight and pain management.  (TR. 221, 228). In September 2005, therapist Blatter's diagnosis remained depressive order not otherwise specified (311) and Plaintiff's GAF score was 62.  (TR. 226). Plaintiff had improved but still suffered from anxiety, decreased energy, depression, sleep disturbance, and somatic complaints.  (Id.).  Additionally, Plaintiff experienced appetite disturbance.  (Id.).  Treatment goals included decreasing Plaintiff's depression and anxiety, developing her own interests, and improving her relationship with her husband.  (Id.).

On September 28, 2005, therapist Blatter wrote to Alexander Villares, M.D., to express concern that Plaintiff had become undernourished since having  gastric bypass surgery.  (TR. 232). Since that surgery, Plaintiff had reported persistent vomiting, loss of appetite due to fear of eating and vomiting, large amounts of hair falling out, lack of energy, and mild depressed mood and anxiety related to these physical problems. (Id.).

In January 2006, therapist Blatter diagnosed Plaintiff with depressive disorder not otherwise specified (311) and generalized anxiety disorder (300.2).  (TR. 462). Plaintiff had anxiety, appetite disturbance, depression, sleep disturbance, and somatic complaints.  (Id.). Her GAF score was 64.  (Id.).  Treatment goals included increasing assertive behavior and self esteem, decreasing anxiety and depression, improving marital communication and finding interests and hobbies.  (Id.).  A July 2006 record from therapist Blatter indicated similar findings.  (TR. 580).

2.      Non-Examining State-Agency Physicians

a.      Physical Impairments

In February 2005, F.A. Shallenberger Jr., M.D., noted that "[r]eveiw of [Plaintiff's] medical records indicates she has had recurrent Renal calculi with some hydronephrosis" and Plaintiff's past history of herniated disc and snapping hip syndrome.  (TR. 457). Dr. Shallenberger pointed out that

> Function Report from [Plaintiff]..., lives with family, takes care of school age kids, cooks, household chores, husband in Military (gone a lot), drives, attends church and social groups, uses no assistive devices.  3rd party (friend) confirms [Plaintiff] is able to function without limitations.

(Id.).  Dr. Shallenberger's conclusion was that Plaintiff was not disabled for purposes of the Social Security Act. (Id.).

In June 2005, Robert Estes,  M.D., completed a Physical Residual Functional Capacity Assessment concerning Plaintiff wherein he opined that Plaintiff could lift up to 50 pounds occasionally and up to 25 pounds frequently; she could stand and/or walk about 6 hours in an 8-hour work day; she could sit about 6 hours in an 8-hour work day with normal breaks; and she had no limitations with pushing and/or pulling.  (TR. 267).    To support this conclusion, Dr. Estes stated: "Obese claimant with recent weight of 277 pounds (height not recorded)[6] with chronic low back pain, imaging evidence of some degenerative lumbosacral disease with herniated disc L5-S1.  Normal strength, range of motion, reflexes and sensation.  Claimant has renal calculi without sign of hydronephrosis." (Id.).  Dr. Estes further indicated no postural limitations except that Plaintiff should climb ladders, ropes or scaffolds only occasionally.  (TR. 268).  Dr. Estes also opined that Plaintiff should "avoid concentrated exposure" to vibration, and hazards such as machinery and heights.  (TR. 270). Dr. Estes stated that Plaintiff's activities of daily living "are consistent with physical findings accepting that claimant's chronic pain is credible.  Functional loss is minimal, noting however severe

---

[6]On another form, Dr. Estes amended his statement to reflect that Plaintiff was five feet six inches in height. (TR. 460)

obesity." (TR. 273).   Dr. Estes further stated that "[f]unctional loss has not been demonstrated to persist for any consecutive twelve month period with normal strength, range of motion, gait in spite of imaging evidence of lumbar spine degenerative disease with herniated disc at L5-S1." (TR. 460).

### C.     Vocational Expert Testimony

At the February 23, 2006 hearing, Vocational Expert (hereinafter "VE") Kathleen McAlpine testified. VE McAlpine identified Plaintiff's past relevant work as a clerk at a rod and gun club as "light and semi-skilled..." with a special vocational preparation (hereinafter "SVP") of 3; as a waitress as light and semi-skilled with an SVP of 3; and as a kennel/veterinary technician, which the VE termed "[a]nimal health technician" as medium and skilled with an SVP of 6. (TR. 655-656).

The ALJ asked the VE a hypothetical question concerning an individual of Plaintiff's age, education and work history who: due to "bad back problems..." is limited to lifting 10 pounds on a frequent basis, 20 pounds on an occasional basis; "has pain in various parts of her body, and–primarily in her back and her left leg, her abdomen" and in her hips; and has kidney stones. (TR. 657). The ALJ asked the VE to assume that such a person had a pain level

> of a slight nature and would have a slight effect on her ability to do basic work activities, or that condition is or can be controlled by appropriate medication without significant adverse side effects.  This hypothetical person also has some psychiatric problems in the form of depression and anxiety, both of which are of a slight nature and would have a slight effect on her ability to do basic work activities, or those conditions are or can be controlled by appropriate medication without significant adverse side effects.  So, could hypothetical person number one, with slight or controlled pain, be able to do any of the past work that was done by the Claimant, Ms. Werle?

(Id.). VE McAlpine responded that such a person could perform Plaintiff's past work as a receptionist, which is sedentary and semi-skilled work with an SVP of 4. (TR. 657). Such person could also perform Plaintiff's past work as a waitress and, to the extent Plaintiff's past work required work as a cashier, the hypothetical person could also work as a cashier. (TR.

658-659).  However, such person could not work as either a veterinary technician, or as a

clerk in a gun club, because of the lifting and carrying requirements.  (TR. 659).

If the same hypothetical person had "more [pain]....of a moderate nature...and would

normally have a moderate effect on her ability to do basic work activities, or that condition

is or can be controlled by appropriate medication without significant adverse side effects."

(TR. 659-660). Additionally, the person

> also has some moderate level of psychiatric problems in the form of depression
> and anxiety, which...are or can be controlled by appropriate medication
> without any significant adverse side effects.  So could hypothetical person
> number two, with moderate–with controlled pain and psychiatric problems be
> able to do the work of the receptionist and the waitress, as done by Ms. Werle
> or as described in the *Dictionary of Occupational Titles*?

(TR. 660). According to VE McAlpine, such person could do the work of a receptionist and

waitress as previously done by Plaintiff.  (Id.).

The ALJ next posed a hypothetical question concerning a person who had all the same

factors as before

> except now the pain is severe and the psychiatric problems are...severe.  They
> are so severe that there is no amount of pain medication, nor is there any
> psychotropic medication that would help alleviate these problems.  Or if they
> did, then the side effects of these medications would be so significantly
> adverse that they would markedly interfere with the ability to maintain pace
> and concentration.

(TR. 659-660).  VE McAlpine testified that such person could not perform the work of a

receptionist or a waitress.  (Id.).  Nor does work exist in the national economy which this

person could perform.  (TR. 661).

Finally,  the  ALJ  asked  the  VE  to  assume  the  limitations  set  out  in  the  first

hypothetical except as modified by Dr. Ramirez's identified limitations.  (Id.).  VE McAlpine

testified that such person would be unable to perform Plaintiff's past work or other work in

the national economy.  (TR. 662).

Upon questioning by Plaintiff's counsel, VE McAlpine testified that, assuming the

ALJ's first hypothetical and adding the limitation of  "less than occasional stooping", the

person  would be unable to work as a waitress because "[s]he might have to stoop more than occasionally" but that person would be able to work as a receptionist. (TR. 663).  An ability to stand and walk less than two hours during an eight hour work day in addition to restricted stooping and the limitations listed for the ALJ's first hypothetical would not prevent the person from working as a receptionist. (Id.).  If the person were to miss one day a week due to any combination of her symptoms, "[s]he could probably get the job, but she wouldn't be able to maintain it, being absent one day a week."  (Id.).

D.    Lay Statements

Plaintiff submitted a statement from her friend Gloria York. (TR. 103-110). Ms. York indicated that Plaintiff's condition limits Plaintiff's ability to garden and walk. (TR. 104). Plaintiff prepares meals, does laundry, cooks, cleans, drives and does yard work but is limited in doing house or yard work.  (TR. 105-106). Back injuries limit Plaintiff's ability to lift, squat, bend, stand, walk, kneel, and stair climb.  (TR. 108). When asked how Plaintiff handles stress, Ms. York responded that "[a]t times she will get overwhelmed."  (TR. 109).

E.    The ALJ's Findings

1.    Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id*.  If the ALJ makes a

- 26 -

finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[7] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.   20 CFR §§ 404.1520(f). 416.920(f).   At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v*. *Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).   However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use

---

[7]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

        2.      The ALJ's Decision

In his June 14, 2006 decision, the ALJ made the following findings:[8]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2006.

2.      The claimant has not engaged in substantial gainful activity at any time relevant to this decision. (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: pain in the back, left leg, abdomen and hips; kidney stones; status post gastric surgery in June 2005 (has lost 110 pounds); depression; and, anxiety. (20 CFR 404.1520(c)).

        The claimant has been diagnosed with and treated for pain in the back, left leg, abdomen and hips; kidney stones; obesity; depression; and anxiety, and some examiners observed that the claimant had significant limitations due to these conditions. They are, therefore, severe.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

        ***

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to sit unrestricted hours/8 hour workday; stand/walk unrestricted hours/8 hour workday; lift/carry 10 pounds frequently and 20 pounds occasionally; has moderate level of pain, controlled by appropriate medications without significant adverse side effects; and, mental impairments are controlled by appropriate medications without significant adverse side effects.

        ***

6.      The claimant is capable of performing past relevant work as receptionist and waitress. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

---

[8]Citation within the ALJ's findings to the exhibits is omitted unless otherwise indicated.

[The ALJ credited the VE's testimony]...that the claimant's work as receptionist (sedentary, semi-skilled, SVP 4) and waitress (light, semi-skilled, SVP 3) qualify as past relevant work....The impartial vocational expert testified that based upon the claimant's residual functional capacity, the claimant could return to her past relevant work as receptionist and waitress as generally performed.

***

7.    The claimant has not been under a "disability," as defined in the Social Security Act, from December 9, 2002 through the date of this decision (20 CFR 404.1520(f)).

## DECISION

Based on the  application for a period of disability and disability insurance benefits protectively filed on September 24, 2004, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(TR. 15-21)

In reaching his decision, the ALJ considered treating Dr. Needham's assessment "generally credible but not to the extent alleged, because..."  treating physicians responded with limited and conservative treatment and Dr. Needham's assessment was based primarily on Plaintiff's subjective statements.   (TR. 20)   With regard to Plaintiff's alleged mental impairments, the ALJ discussed the opinions of Dr. Flynn and Dr. Ramirez  and granted Plaintiff "the benefit of the doubt..." to find  that she "had the following mental limitations...: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace."  (Id.).

The ALJ gave the state agency medical opinion little weight regarding Plaintiff's RFC "because evidence received at the hearing level show[ed] that the claimant is more limited than determined by the State Agency consultant."  (Id.).

Additionally, the ALJ stated that although Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms...the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (TR. 18) (emphasis omitted).

- 29 -

III.    DISCUSSION

    A.    Argument

Plaintiff argues that the ALJ improperly rejected treating Dr. Ramirez's opinion concerning Plaintiff's mental limitations.  She also argues that the ALJ improperly rejected her credibility and that the ALJ's questions posed to the VE did not properly address Plaintiff's combined impairments.  She requests an immediate award of benefits or, alternatively, that the Court credit Dr. Ramirez's and Plaintiff's testimony as true and remand for further proceedings.

Defendant asserts that the ALJ properly rejected Dr. Ramirez's opinion, the ALJ properly assessed Plaintiff's credibility, and the VE's testimony constituted substantial evidence in support of the ALJ's opinion.

    B.    Standard of Review

An individual is entitled to disability insurance benefits if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423, 1382.  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d

at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.      Analysis

1.      Dr. Ramirez's Opinion

In February 2006, treating psychiatrist Dr. Ramirez opined that Plaintiff was moderately limited in five out of eight listed abilities regarding sustained concentration and persistence and she was mildly limited in one of the remaining three abilities under that category.[9] (TR. 492). Plaintiff was also moderately limited in all five areas of abilities regarding social interactions.[10] (TR. 492-493). With regard to the four areas of abilities associated with adaptation, Plaintiff was moderately limited in two and mildly limited in

---

[9]Specifically, Dr. Ramirez opined that Plaintiff was moderately limited in her ability to: (1) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (2) sustain an ordinary routine without special supervision; (3) work in coordination with or proximity to others without being unduly distracted by them; (4) make simple work-related decisions; and (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (TR. 492). Plaintiff was mildly limited in her ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure). (Id.)

[10]The ability to: (1) interact appropriately with the general public; (2) ask simple questions or request assistance; (3) accept instructions and to respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (5) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (TR. 492-493)

two.[11] (TR. 493). Dr. Ramirez also indicated that Plaintiff's limitations lasted 12 continuous months or were expected to last 12 continuous months.  (Id.).  He provided a written statement to support his opinion.  (TR. 494).

"The ALJ must consider all medical opinion evidence."  *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (*citing* 20 C.F.R. §404.1527(b)).  "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  SSR 96-6p.[12]  Thus, "[t]hose physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships."  *Carmickle v.  Commissioner,* 533 F.3d 1155, 1164 (9th Cir. 2008) (*citing Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. §§404.1527(d), 416.927(d)).  "As such, the ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing' reasons.'"  *Id.* (*citing Lester,* 81 F.3d at 830-31).  Where such an opinion is contradicted, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *Id.*  When rejecting the opinion of a treating physician, the ALJ can meet his "'burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'"  *Tommasetti,* 533 F.3d at 1041 (*quoting Magallenes,* 881 F.2d at 751)).

The ALJ discussed the medical evidence concerning Plaintiff's mental impairment as follows:

_____

[11]Plaintiff was moderately limited in the ability to: (1) respond appropriately to changes in the work setting; and (2) set realistic goals or to make plans independently of others.  (TR. 493). She was mildly limited in the ability to: (1) be aware of normal hazards and to take appropriate precautions; and (2)  travel to unfamiliar places or use public transportation.  (Id.).

[12]Social Security Rulings ("SSR") "do not have the force of law....Nevertheless, they constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir. 1989)(citations omitted).

Psychological evaluation was performed on April 21, 2005 by Sean Flynn, Ph.D.  The claimant noted that she was not taking any medications for emotional problems.  She admitted to a history of counseling for anxiety and marital issues.  She was neatly dressed and groomed.  She did not appear unusually anxious and eye contact was good throughout the interview.  Her thought process appeared logical and coherent.  The diagnoses included depressive disorder, not otherwise specified; and, anxiety disorder, not otherwise specified. The claimant's GAF was reported to be 75...In May 2005 the claimant was evaluated by Alfredo Ramirez, M.D., psychiatrist, who diagnosed major depression, recurrent; and anxiety disorder, not otherwise specified.  The claimant showed no signs of psychosis and her GAF was 75. She was started on Prozac....Dr. Ramirez reported in June 2005 that the claimant was doing much better with Prozac....More recently, in February 2006 Dr. Ramirez reported that the claimant was moderately limited in ability to maintain concentration and persistence; to interact appropriately in social interactions; and to adapt.  He felt that the claimant would have a difficult time being in a regular work situation....

Granting the claimant the benefit of the doubt, the undersigned finds that the claimant has the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace.

(TR. 19-20).

Plaintiff contends that the ALJ rejected treating Dr. Ramirez's opinion without providing any reason.  Plaintiff cites the VE's testimony that based upon Dr. Ramirez's assessment, Plaintiff would be unable to perform her previous employment or other employment.

Defendant asserts that "Dr. Flynn's GAF assessment plainly contradicts the GAF assessments of Dr. Ramirez...."  (Defendant's XMSJ, p.3).  Defendant points out that Dr. Flynn assessed Plaintiff's GAF score at 75, whereas  Dr. Ramirez "routinely set" Plaintiff's GAF score at 50.  (Id.). Defendant also argues that the ALJ was entitled to "give more weight to a more detailed medical evaluation than to a fill-in-the-blank type questionnaire, which describes Dr. Ramirez's fibromyalgia [sic[13]] questionnaire."  (Id. at p.4 (citing *Crane v. Shalala,* 76 F.3d 251 (9th Cir. 1996)).  Defendant also points out that the ALJ found that

---

[13]Dr. Ramirez completed a questionnaire concerning Plaintiff's mental impairments. (TR. 491-494). The record does not suggest that fibromyalgia is at issue.

- 34 -

Plaintiff's mental impairments were effectively controlled by appropriate medications.  (Id.).  Therefore, according to Defendant, the ALJ met his burden because he "carefully delineated the findings of all medical sources of record, and made specific findings."  (Id.).

Dr. Flynn, who saw Plaintiff once, examined Plaintiff "as part of a presurgical screening process" for gastric bypass surgery in April 2005.  (TR. 167).  MMPI-2 test results suggested that although Plaintiff was "not experiencing a great deal of difficulty at this time...she did have a response pattern similar to individuals who are experiencing some symptoms of depression, particularly the subjective elements of depression such as having unhappiness, low energy, nervousness, feeling inferior, etc."  (TR. 168).  The test results also "suggested that  she might have difficulty with anxiety and with feelings of being isolated and not understood by others."  (Id.).  Dr. Flynn concluded that, based upon the MMPI-2 results, Plaintiff "may be experiencing some depression and anxiety at this time."  (Id.).  He recommended that Plaintiff "consider meeting with a therapist to discuss her mood and the life situations that may be contributing to symptoms of depression and anxiety."  (Id.).  He also recommended she seek a psychiatric evaluation to determine whether medication may help her.  (Id.).  He assessed a GAF of 75.  (TR. 169).

The following month, Plaintiff began treatment with Dr. Ramirez, who, consistent with Dr. Flynn, assessed a GAF score of 75.[14]  (TR. 158). Based upon information obtained during the intake evaluation including Plaintiff's history and mental status examination,  Dr. Ramirez diagnosed "Major Depression Recurrent", "Dysthymia," and "Anxiety NOS" and prescribed Prozac.  (TR. 162). The next month, Dr. Ramirez noted that Plaintiff "is doing much better with the Prozac.  She is noted to have the ability to smile, to not be as irritable and is eating less.  She is anxious about her upcoming surgery."  (TR. 165). He assessed her GAF at 70. (Id.).  In July, 2005, Dr. Ramirez noted Plaintiff's report that she was doing much

_____

[14]A fair reading of the record suggests that Plaintiff sought treatment from Dr. Ramirez based upon Dr. Flynn's recommendation that she seek psychiatric evaluation.

better emotionally and he noted "decreased effects of Prozac." (TR. 165).  In October 2005, Dr. Ramirez prescribed Lorazepam in addition to Prozac.  (TR. 563).   From June 2005 through January 2006, Dr. Ramirez indicated Plaintiff's GAF score was 70.  (TR. 163-164, 562, 563).

On February 6, 2006, Dr. Ramirez completed the assessment which was rejected by the ALJ.  (TR. 491-494)  On February 18, 2006, he noted that Plaintiff was experiencing more stress at home and was "very anxious even with the Lorazepam...."  (TR. 561). Beginning in February 2006, he also prescribed Klonapin in addition to Prozac and Lorazepam and assessed Plaintiff's GAF of 50.  (Id.).  Dr. Ramirez's records from March 2006  through July 2006 note Plaintiff's continued anxiety and GAF at 50.  (TR. 555-560). Also, in June and July 2006, Plaintiff's severity level rose from 7/10 to 8/10.  (TR. 555-557).

The ALJ did not reject all of Dr. Ramirez's opinions.  While the ALJ rejected Dr. Ramirez's opinion that Plaintiff had moderate limitations with regard to social functioning/interactions and some aspects of adaptation, the ALJ did "[g]rant[] the claimant the benefit of the doubt..." in concluding, consistent with Dr. Ramirez, that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace.  (TR. 20).

Defendant posits that the reason for the ALJ's decision to reject Dr. Ramirez's recommended limitations is the differing GAF scores between Dr. Flynn who assessed  a score of 75 and Dr. Ramirez who "routinely" assessed a score of 50.[15]  (Defendant's XMSJ,

---

[15]     GAF Scores range from 1-100.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed.). In arriving at a GAF Score, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Id.*  Physical and environmental factors are not included. *Id.*  With a GAF Score between 71-80, "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork)."  *Id.* (emphasis omitted).  A GAF between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within  the  household),  but  generally  functioning  pretty  well,  has  some  meaningful

p. 3). However, the ALJ did not cite such a conflict between Dr. Flynn and Dr. Ramirez. Instead, the ALJ noted that *both* Dr. Flynn, in April 2005, and Dr. Ramirez, in May 2005, assessed a GAF score of 75.  (TR. 19). Dr. Flynn's report and Dr. Ramirez's initial report were issued within approximately one month of one another.  Nothing in Dr. Flynn's report rules out Dr. Ramirez findings at that time. *See Regennitter v. Commissioner,* 166 F.3d 1294, 1299 (9th Cir. 1999) (doctors' reports do not contradict one another when nothing in one report rules out the other report).

Dr. Ramirez treated Plaintiff from May 2005 through at least July  2006, whereas Dr. Flynn saw Plaintiff once.  "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."  20 C.F.R. §§404.1527(d)(2)(i), 416.927(d)(2)(i) (also noting that when the treating source has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment, the source's opinion is given more weight than if the opinion were from a nontreating source).  The converse is also true in that a treating physician's opinion may be entitled to little if any weight "for instance, if the treating physician has not seen the patient long enough to 'have obtained a longitudinal picture' of the patient's impairments...offers an opinion on a matter not related to his or her area of specialization...and presents no support for her or his opinion on the matter."  *Holohan v. Massanari,* 246 F.3d 1195, 1203 n.2 (9th Cir. 2001) (*citing* 20 C.F.R. §§404.1527(d)(2)(i),(d)(3),(d)(5)).  Herein, Dr. Ramirez saw Plaintiff virtually monthly for over one year; the area of treatment, psychiatry, is his

_____

interpersonal relationships."  *Id.*  (emphasis omitted).  A GAF score between 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  *Id.*(emphasis omitted). "[C]ourts have specifically held that a GAF score does not directly correlate to disability."  *Vose v. Astrue,* 2007 WL 4468720, *17 (D.Ariz. Dec.17, 2007) (citations omitted)).

speciality; and his treatment notes reflect his observations and opinions of Plaintiff, and his February 6, 2006 medical source statement contains his written reasons supporting his assessment including depression, anxiety, feelings of guilt without any rational reason, and low self-esteem that affect her ability to interact with peers in the work place.

After treating Plaintiff for nine months, Dr. Ramirez noted Plaintiff's increased stressors at home and increased problems with anxiety and he assessed a GAF of 50. The ALJ never mentioned that Dr. Ramirez assessed a GAF of 50 several months after Dr. Flynn's assessment. Plaintiff persuasively points out that "[t]he entire discussion about whether or not GAF score or findings serve as controverting evidence is merely speculating about what the source was for the ALJ's determination. Whether controverted or uncontroverted, the Commissioner is required to give a specific legitimate reason for rejecting a treating source opinion." (Plaintiff's Reply, p.2). Here, Plaintiff is correct that the ALJ failed to meet his burden because he "rejected the opinion of the treating psychiatrist without giving any specific reason." (Id.).

Equally without merit is Defendant's argument that the ALJ accounted for Plaintiff's mental limitations but found that they were adequately controlled by medication. (Defendant's XMSJ, p.4 (*citing* TR. 18)). Defendant cites the ALJ's statement that "Dr. Ramirez reported in June 2005 that the claimant was doing much better with the Prozac." (TR. 19-20). The record reflects that one month after Plaintiff started taking Prozac, Dr. Ramirez reported that she was "doing much better with the Prozac." (TR. 165). The record also reflects "decreased effects of the Prozac" the following month. (TR. 164). By February 2006 and thereafter Plaintiff reported heightened anxiety "even with the Lorazepam" which was prescribed in addition to Prozac in October 2005. (TR. 561; *see also* TR. 563). Beginning in February 2006, Dr. Ramirez added a prescription for Klonapin. (TR. 561).

Defendant cites Plaintiff's testimony that she believed Prozac helped with her depression and that "[w]e're working on the anxiety. They just put me on a new anxiety medication that...maybe work [sic] a little bit better than what I was doing....That one's [sic]

in the repair process, hopefully." (TR. 643; *see also* Defendant's XMSJ, p.4). According to Plaintiff, Defendant's reliance on the fact that Plaintiff improved with Prozac "ignores the combined impairments of [Plaintiff], as Dr. Ramirez is treating [Plaintiff] for depression and anxiety and while noting improvement in depression with the adjustment of medication, the doctor also notes [Plaintiff] continues to have problems with anxiety." (Plaintiff's Reply, p.2). Plaintiff's argument is well-taken. *See Holohan,* 246 F.3d at 1205 (a treating physician's comments that the plaintiff has made some improvement must be read in context of the overall diagnostic picture). But for the ALJ's reference to Dr. Ramirez's June 2005 note that Plaintiff was doing better on Prozac, the ALJ cites neither medical records nor portions of Plaintiff's testimony as a reason to reject Dr. Ramirez's February 2006 assessment with regard to Plaintiff's combined mental impairments.[16] Dr. Ramirez, who was well aware of the medications Plaintiff was taking for mental impairments, determined in

---

[16]The ALJ's rejection of a claimant's credibility may, in some circumstances, be relied upon by the ALJ as evidence to also reject a treating physician's opinion. In a case, like the instant case, where the ALJ has determined that the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the alleged symptoms, the ALJ must set forth specific, clear and convincing reasons to reject a claimant's credibility. *See Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996) ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion.") In doing so, the ALJ may consider, among other things, effectiveness of medication. *See Id.* at 1284. Herein, the ALJ noted Plaintiff's testimony that she took Prozac, Lorazepam, and Clorizapan. (TR. 18). He also noted that Plaintiff "experiences light headedness and feeling 'out of it' for 2-3 hours after taking her Lorizapan [sic]." (Id.). Although the ALJ found that Plaintiff's allegations concerning the limiting effects of her symptoms was not entirely credible, he did not cite as a reason for such finding that Plaintiff's medication adequately controlled her mental impairments. With regard to Plaintiff's mental impairments, the ALJ's decision provides no basis for his conclusion that Plaintiff's combined mental impairments were adequately controlled by medication. Defendant's reference to Plaintiff's testimony that her anxiety medication "maybe work [sic] a little bit better than what I was doing..." (TR. 643) does not change the analysis given that the ALJ did not cite this evidence when making his credibility determination. It is well-settled that the court cannot affirm the ALJ's credibility finding based upon evidence that the ALJ did not discuss. *Connett,* 340 F.3d at 874.

February 2006 that Plaintiff's mental impairments limited her in such a way that, based upon the VE's testimony, rendered Plaintiff unable to perform her previous work or other work in the national economy. (*See* TR. 661-662). On this record, the ALJ did not meet his burden in rejecting Dr. Ramirez's testimony.   "Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester,* 81 F.3d at 834 (citation omitted).

Plaintiff requests that the Court "reverse the decision of the Commissioner, credit the opinion of the treating psychiatrist as true...and issue an order awarding benefits from the date of the doctor's assessment with a remand for further proceedings and a determination whether an earlier disability onset is warranted based on the combined impairments." (Plaintiff's Reply, p.11).  "'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)  (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* (citations omitted)  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Benecke,* 379 F.3d at 593 (citations omitted); *see also Lester,* 81 F.3d at 834 (same).

Herein,  the ALJ failed to provide legally sufficient reasons to reject Dr. Ramirez's opinion.  The VE testified that application of Dr. Ramirez's opinion with regard to Plaintiff's mental impairments together with the ALJ's RFC with regard to Plaintiff's non-mental

impairments, would result in the conclusion that such a person would be unable to perform Plaintiff's past work or other work within the national economy.  (TR. 661-662).

Under the instant circumstances, it is clear from the record that if Dr. Ramirez's February 6, 2006 opinion is credited as true, the ALJ would be required to find the claimant disabled post February 6, 2006.  No outstanding issues must be resolved before a determination of disability can be made post February 6, 2006 and for that reason, it is clear on the instant record that upon crediting Dr. Ramirez's opinion, the ALJ would be required to find Plaintiff disabled and entitled to benefits as of February 6, 2006.  *See Benecke,* 379 F.3d at 593-595 (remanding for an award of benefits where no outstanding issues remain and ALJ would be required to find claimant disabled if  evidence is credited); *Regennitter,* 166 F.3d at 1300 (where the court "conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits."); *Lester,* 81 F.3d at 834 (remanding for payment of benefits because, after crediting doctor's opinion as true, *inter alia,*"the evidence...demonstrates that..."  the plaintiff was disabled.);  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion); *Winans,* 853 F.2d at 647  (same).  Accordingly, all three factors that the Court must consider support Plaintiff's request to remand the matter for an award of benefits post February 6, 2006.  *Benecke,* 379 F.3d at 595 (recognizing that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" (*quoting Varney  v. Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988) (*Varney II*)).  However, Plaintiff points out that disability onset prior to the date of Dr. Ramirez's February 2006 assessment remains at issue.  Therefore, this matter should also be remanded for a determination whether an earlier disability onset is warranted based on consideration of Plaintiff's combined impairments.

2.      Plaintiff's Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."   *Orn v. Astrue,* 495 F.3d 625, 636 (9th 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing.  *Id.; Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006).  Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen,* 80 F.3d at 1284; *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or internal contradictions in that testimony.")

The ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms,..." her "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (TR. 18).  To support his finding, the ALJ stated that treating physicians responded with limited and conservative treatment which:

- 42 -

is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant.  Additionally, she is not currently taking pain medication on a daily basis, although she asserts that she suffers from all pervasive pain.  She has not been prescribed a TENS unit and there has been no surgical treatment.  This indicates her treating doctor did not believe her pain symptoms were as serious as alleged.  Additionally, her extensive daily activities (including taking care of her children, household, and pets) show a higher residual functional capacity than alleged).

(TR. 18-19; *see also* TR. 20 ("The record as a whole does not support the level of severity of pain and other limitations alleged by the claimant.  Specifically, statements made by the claimant regarding her activities of daily living show a much higher residual functional capacity than alleged....As such, the above residual functional capacity is appropriate and supported by the medical evidence of record when viewed in its entirety.").

Plaintiff argues that the ALJ's findings fail to consider her combined impairments and that the ALJ's assessment of Plaintiff's medical treatment and daily functioning is mistaken.

Defendant stresses that the ALJ "noted the widely divergent medical findings of record..." and that the ALJ may properly point to inconsistencies between a claimant's testimony and the objective medical evidence as part of his credibility analysis although he may not rely exclusively on a lack of objective evidence to find that a claimant is not credible.  (Defendant's XMSJ, p.6 (*citing* Dr. Estes's and Dr. Flynn's opinions)).  Nonetheless, the ALJ must set forth specific and cogent reasons for his determination that the claimant is less than credible.  *See Orn,* 495 F.3d at 635.  Moreover, as Defendant concedes, the ALJ ultimately rejected Dr. Estes's opinion "because evidence received at the hearing level shows that the claimant is more limited than determined by the State Agency consultant."  (TR. 28; *see also* Defendant's XMSJ, p. 6).

To discount Plaintiff's subjective complaints, the ALJ characterizes Plaintiff's medical treatment as "limited and conservative."  (TR. 18).  The record reflects that since 2001, Plaintiff repeatedly sought treatment for back pain and since 2003 she repeatedly

sought treatment for pain associated with recurrent kidney stones.[17]  She was prescribed an array of pain medication for both conditions.[18]

Additionally, with regard to back pain, Plaintiff was prescribed muscle relaxers, was instructed to use heat or cold presses, underwent multiple courses of physical therapy, attended "back school," and underwent epidural steroid injections.  Surgery, arguably one of the most aggressive and invasive treatments, was in discussed 2002 and ultimately rejected because of Plaintiff's weight.  (*See* TR. 347, 375, 397). In 2003, Plaintiff "considered having a stomache [sic] banding procedure to help lose weight...." (TR. 336). In 2005, Plaintiff opted to have gastric bypass surgery to, among other things, "assist her in losing excessive weight which should alleviate her chronic pain in the hip, back, and general body aches." (TR. 159; *see also* TR. 142-145) In 2006, Dr. Needham opined that Plaintiff was "not a

---

[17]Although the first reports of kidney stones occurred in October and November 2000, Plaintiff did not again seek treatment for kidney stones until 2003.

[18]In November 2000, Plaintiff received some form of pain management for kidney stones.  (TR. 419).  In late 2001, Plaintiff was prescribed Naprosyn, Valium and Tylenol 3. (TR. 412, 414 (back)). Plaintiff continued on Valium through June 2002 when Percocet was prescribed.  (TR. 379 (back)) In July 2002, she reported taking Percocet or Valium "every other month for a couple of days on average when the pain gets severe." (TR. 381(back)). In August 2002, she was taking Naprosyn.  (TR. 387 (back)). In March 2003, Plaintiff was prescribed Percocet. (TR. 324(back)) In July 2003, she was given an injection of Ketorolac and Valium was prescribed. (TR. 337, 340 (back)) In July and September 2003, she took Percocet as needed.  (TR. 342, 346, 348 (kidney stones)). In November 2003, she was prescribed Darvocet. (TR. 358 (kidney stones))  By December 2003, she was taking Vioxx (TR. 363-364 (back)) and Percocet (TR. 367 (kidney stones)). Percocet was again prescribed in March 2004.  (TR. 439 (kidney stones)).  In August, September, and November 2004, she took Percocet or Darvocet (TR. 311-313, 316,  434-435 (kidney stones)).  Percocet was prescribed in February, March, June, and August 2005.  (TR. 209, 277, 282-283 (kidney stones)).  Darvocet and Toradol were prescribed in December 2005 (TR. 479 (kidney stones)).  In January 2006, Amityptline,  (TR. 476 (back)), and  Darvocet were prescribed. (TR. 277 (kidney stones)).  In April,  May, and June 2006 Plaintiff took Percocet, Vicodin, Oxycodone/APAP (Percocet).  (TR. 528, 539, 587, 584, 602, 604, 607, 615-619 (kidney stones)).  She was also injected with Ketorolac in June 2006.  (TR. 604 (kidney stones)).  It may well be that Plaintiff's pain medication for kidney stones also alleviated her back pain during that time and vica versa.

surgical candidate at present, although she might be a surgical candidate in the future if her pains become more severe and more consistent." (TR. 503). Dr. Needham, nonetheless, concluded that Plaintiff was disabled from work. (Id.)

To the extent that the ALJ discounted Plaintiff's credibility because a TENS unit was not prescribed, there is no medical evidence in the record suggesting that such treatment would alleviate Plaintiff's symptoms and/or was appropriate treatment in Plaintiff's case. Further, the record supports the conclusion that, at least until Plaintiff's gastric bypass surgery in June 2005, more aggressive treatment such as fusion surgery was not appropriate in Plaintiff's case because of her weight. The ALJ overlooked that Plaintiff was motivated to have gastric bypass surgery, in part, to alleviate her back and hip pain. However, the ALJ is correct that by February 2006, surgery was not recommended. In February 2006, post Plaintiff's gastric bypass surgery and 110-pound weight loss, Dr. Needham did not think surgery was necessary at that time. Yet, Dr. Needham noted that Plaintiff experienced pain "approximately 4 days out of every 7..." and intermittently "on the 3 good days..." (TR. 503) He concluded that Plaintiff was disabled from work.

In sum, the ALJ's conclusion is technically correct in that at some point post-gastric bypass surgery, Plaintiff's treating physician found back surgery was unnecessary. Prior to that time, the substantial evidence of record does not support the ALJ's finding.

Plaintiff points out that the ALJ's credibility finding focused on Plaintiff's spine pain and overlooked Plaintiff's kidney stones. (Reply, p.3) The ALJ's credibility findings do not specifically mention Plaintiff's kidney stones. It is unclear whether the ALJ's statement that Plaintiff received "limited and conservative treatment" (TR. 18) also applied to Plaintiff's kidney stones.

Plaintiff has suffered bouts of kidney stones and resultant pain periodically since October 2000. In November 2000, Plaintiff received some form of pain management treatment when she presented to the emergency room with kidney stones. (TR. 419). She reported passing additional stones in May, June and July 2003. In July, September,

November and December 2003, she took Percocet or Darvocet as needed.  (TR. 342, 346, 348, 358, 367).  In January 2004 more stones were detected on a CT scan.  (TR. 440).  In March 2004 Plaintiff presented with complaints of pain and Percocet was again prescribed.  (TR. 439) Plaintiff continued to complain of kidney stone related pain and symptoms in May and June, 2004.  (TR. 436-437, 309).  Her prescription for Darvocet was refilled in August and September 2004.  (TR. 311, 434-435).  In November, 2004 she presented four times with complaints of abdominal pain associated with kidney stones and Darvocet and Percocet were prescribed.  (TR. 312, 313, 316, 429-430).  Percocet was prescribed in February and March 2005.  (TR. 279, 299, 282-283).

In April 2005, Dr. Ramakumar decided against surgical removal and instead recommended "aggressive metabolic evaluation and medical management." (TR.293).  In June and August  2005 Plaintiff received Percocet.  (TR . 209, 277).  When a September 2005 CT scan showed kidney stones, Plaintiff underwent right ureteroscopic laser lithotripsy in an effort to break the stones into small pieces.  (TR. 192-198) In December, 2005, Darvocet and Toradol were prescribed for pain.  (TR. 478-479).  Darvocet was prescribed in January 2006.  (TR. 477).  In April and May 2006, she was prescribed Percocet followed by Vicodin, Oxycodone/APAP (Percocet) and Ketorolac injections in June 2006.  (TR. 539, 587, 584, 602, 604 607, 615-619).

In July 2006, Plaintiff underwent "[l]eft ureteroscopy with laser tripsy, stone basketing, and stent placement."  (TR. 523).  She was prescribed Vicodin.  (TR. 521).  In August 2006, Dr. Burrows opined that Plaintiff's gastric bypass, which she underwent in part to address her back issues, may have exacerbated her susceptibility to kidney stones in that she is unable to intake the appropriate amount of fluids to ward off kidney stones and that Plaintiff may be "forming uric acid stones from shortcuts" from that surgery.  (TR. 518).  Later that month, Plaintiff's request for Percocet in place of Vicodin due to stomach upset was denied because a recent CT showed no stones.  (TR. 516).  However, a week later, Plaintiff reported "non-stopping pain..." and a CT scan was ordered.  (TR. 515).  No further

medical records address Plaintiff's kidney stone issue.

In sum, the substantial evidence of record before the ALJ reflected not only Plaintiff's continued treatment since 2003 for recurrent kidney stones using pain medication, but that she also underwent two lithrotipsy procedures and temporary placement of a stent. There has been no showing that some other treatment was appropriate for Plaintiff's kidney stones and associated pain.  On the instant record, it was improper for the ALJ to discount Plaintiff's credibility because Plaintiff's treating physicians did not provide some other treatment.

Plaintiff also takes issue with the ALJ's finding that Plaintiff's activities of daily living "show a higher residual functional capacity than alleged."   (TR. 19) Defendant correctly asserts that the ALJ is "clearly allowed to consider the ability to perform household chores, [and] the lack of side effects from prescribed medications..." when evaluating a claimant's credibility.  *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995); (Defendant's XMSJ, p.7 (*citing Orteza,* 50 F.3d at 750)); *see also* SSR 95-5p. The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *see also Vick v. Comm'r. of Soc. Sec.,* 57 F.Supp.2d 1077, 1086 (D. Or. 1999), *aff'd* 5 Fed.Appx. 781 (9th Cir. 2001) ("If a claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work.") "Engaging in activities including household chores is not necessarily inconsistent with a finding of disability." *Vick,* 57 F.Supp.2d at 1085.  However, "if a claimant 'is able to spend a *substantial* part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.'" *Vertigan,* 260 at F.3d. 1049 (*quoting Morgan v. Commissioner,* 169 F.3d 595, 599 (9th Cir. 1999)). "Thus, if a claimant is capable of performing activities including household chores, 'that involve

many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.'" *Vick,* 57 F.Supp.2d at 1085-1086 (*quoting Fair,* 885 F.2d at 603). *See also Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's finding that plaintiff's allegations of disabling pain were undermined by activities such as attending to the needs of two young children, cooking, housekeeping, laundry, and leaving the house daily to go to her son's school and after school activities, doctor's appointments and the grocery store).

Herein, the ALJ pointed to Plaintiff's statements that she "takes care of the household, including cleaning and cooking complete meals.  She prepares food on a daily basis.  She does the laundry, dusting, light gardening, watering and cleaning."  (TR. 18)  The ALJ additionally cited Plaintiff's testimony that she took care of her children, ages 19 and 16, and pets. (TR. 19)  Generally, the court will not disturb the ALJ's credibility finding even when "[i]t may well be that a different judge, evaluating the same evidence, would have found [the plaintiff's] allegations of disabling pain credible."  *Fair,* 885 F.2d at 604.  *See also Rollins,* 261 F.3d at 857 (upholding ALJ's credibility finding even though the plaintiff's "testimony was a somewhat equivocal about how regularly she was able to keep up with all these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one....").  However, Plaintiff also testified that pain medication made her feel "out of it" and often interfered with her ability to fully perform activities of daily living resulting in her reliance on help from family members with making dinner or other chores such as vacuuming. (TR. 648)  Additionally, Lorazepam, which Plaintiff took three times a day, left her feeling light headed and "a little out of it" for a couple of hours.  (TR. 647-648)

The Ninth Circuit has recognized that "the side-effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process."  *Varney v. Secretary of Health & Human Servs.,* 846 F.2d 581, 585 (9th Cir. 1988) (*Varney I*), *rev'd on other grounds upon reh'g,* 859 F.2d 1396 (9th Cir. 1988) (*Varney II*).  *See also Orteza,* 50 F.3d at 750 (9th Cir. 1995) ("Factors an adjudicator may

consider when making...credibility determinations include ...adverse side effects of any pain medication,..."); 20 C.F.R. § 416.929(c)(3)(iv) ("Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information...includ[ing]...[t]he type, dosage, effectiveness and *side effects* of any medication you take or have taken to alleviate your pain or other symptoms...") (emphasis added); SSR 96-8p (side effects of medication must also be considered when determining a claimant's RFC).

The ALJ noted that Plaintiff "experiences light handedness and feeling 'out of it' for 2-3 hours after taking her Lorizapan. [sic]"  (TR. 18) He found that Plaintiff's "moderate level of pain" and her mental impairments were controlled by appropriate medications "without significant adverse side effects...."(TR. 18)  Yet, he never addressed Plaintiff's testimony concerning  side effects from pain medication,  which she took on a regular basis for back pain and pain associated with kidney stones.  Nor did he address the side-effects of the pain medicine in combination with the side-effects of Lorazepam, which Plaintiff took three times per day.

Plaintiff requests that the Court credit her testimony as true and remand for either an award of benefits or further proceedings.  Even if Plaintiff's testimony were credited as true, it is not clear that the side-effects alleged would result in a disability finding without first progressing to steps four and/or five of the sequential analysis.  Further, onset date may be at issue given that Lorazepam was not prescribed until October 2005. Therefore, a remand for benefits is inappropriate.  *See Benecke,* 379 F.3d at 593.

"[A] split of authority has developed..." in the Ninth Circuit over whether a court *must* credit as true a claimant's subjective pain testimony if the ALJ fails to articulate sufficient reasons for discounting it.  *Vasquez v. Astrue,* 547 F.3d 1101, 1106 (9th Cir. 2008) (declining on the facts therein to resolve the question)  *comparing Lester,* 81 F.3d at 834 (holding that when an ALJ improperly rejects a claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony would be credited, the testimony must be

credited as a matter of law) *with Connett,* 340 F.3d at 876 (discussing the Ninth Circuit's conflicting case law and holding that the doctrine is not mandatory because the court has "some flexibility in applying the 'crediting as true' theory").   When the Ninth Circuit adopted the credit-as-true rule with regard to credibility determinations, the court specifically limited application of that rule to cases "'where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited." *Vasquez,* 547 F.3d at 1106 (*quoting Varney II,* 859 F.2d at 1398-99)).   Because it is not clear on the instant record that Plaintiff would be entitled to benefits if her testimony were credited, the matter should be remanded for further proceedings. *See Connett,* 340 F.3d at 876  (recognizing that the court is not required to credit pain testimony and instead remanding for reconsideration of plaintiff's credibility); *Bunnell v. Barnhart,* 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, including ALJ's reassessment of plaintiff's credibility, must be resolved before a disability determination can be made); *Dodrill v. Shalala,* 12 F.3d 915 (9th Cir. 1993) (remanding "for the ALJ to repeat the step four analysis, articulating specific findings for rejecting [the plaintiff's] pain testimony..." among other things.).

### 3.    Vocational Expert

Plaintiff argues that the hypothetical questions posed to the VE did not account for "the functional impact of [her]...kidney stones and side effects from the medications as she testified to and as documented in the record" in combination with Plaintiff's other impairments.  (Plaintiff's Motion, p.15; *see also* Plaintiff's Reply, pp. 3-4)

"Hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant..."   *Embrey v. Bowen,* 849 F.2d 418, 423 (9th Cir. 1988) ("Because the hypothetical posed by the ALJ to the vocational expert did not reflect all of [the plaintiff's] limitations, the expert's opinion has no evidentiary value and cannot support the ALJ's decision." ).  However, the ALJ is not required to include limitations in

his hypothetical questions that he did not include in his RFC assessment.  *See Rollins,* 261 F.3d at 857.  Here, the ALJ found that Plaintiff's severe impairments included pain in the back, left leg, abdomen and hips; kidney stones; status post gastric bypass surgery in June 2005; depression; and anxiety.  (TR. 17)  He included in his hypothetical questions that, among other things, the VE should assume that the claimant "has pain in various parts of her body, and–primarily in her back and her left leg, her abdomen" and in her hips and she has kidney stones.  (TR. 657).  In the first two hypothetical questions the ALJ also included that the person's pain was "controlled by appropriate medication without significant adverse side effects..."  (TR. 657, 659-660).  As discussed *supra,* at pp.48-49, the ALJ has provided no support for his conclusion that Plaintiff's pain and/or mental impairments were controlled by appropriate medication without significant adverse side effects.

The ALJ's inclusion of abdominal pain accounts for Plaintiff's pain associated with kidney stones.  However, the ALJ's  mere mention in the first and second hypothetical questions of  "kidney stones" did not accurately convey the impact of Plaintiff's episodic bouts of kidney stones in combination with her other impairments.

It may well be that after further proceedings concerning side effects of medication and clarifying the impact of Plaintiff's recurrent kidney stones, a VE will determine that Plaintiff was able to perform her previous work or other work in the national economy for the period in question.  Conversely, it may well be that is not the case.  In any event, on the instant record, remand is appropriate for such determination.

## IV.    CONCLUSION

Because the ALJ did not set forth sufficient reasons to reject Dr. Ramirez's February 2006 opinion, that opinion should be credited as true and this matter should be remanded for an award of benefits beginning February 6, 2006.  Additionally, with regard to the period prior to February 6, 2006, this matter should be remanded for further proceedings to determine onset of the limitations identified by Dr. Ramirez on February 6, 2006; the impact of the side effects of Plaintiff's medication for mental impairments, back pain, and pain

- 51 -

associated with kidney stones; and further questioning of a vocational expert.

## V.     RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court:

(1)      grant Plaintiff's Motion for Summary Judgment (Doc. No. 11) to the extent that: (a) this matter should be remanded for an immediate payment of benefits for the period beginning February 6, 2006; and (b) this matter should be remanded for further proceedings with regard to the period prior to February 6, 2006 for determination of the date of onset of the limitations identified by Dr. Ramirez on February 6, 2006; for determination of the impact of the side effects of Plaintiff's medication for mental impairments, back pain, and pain associated with kidney stones; and for further questioning of a vocational expert; and

(2)      deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 16); and

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CV 07-400-TUC-FRZ**.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).   Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to *de novo* review of the issues.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 7th day of April, 2009.

_____

Héctor C. Estrada
United States Magistrate Judge